# United States District Court

## SOUTHERN DISTRICT OF INDIANA

UNITED STATES OF AMERICA

V.

HUGO RAMON ROSALES-MORENO,
CHRISTIAN PAZ-RECARTE,
KATHERINE MONIC NAVARRO, and
KELIN CLARISSEL MORALES-MARTINEZ

## CRIMINAL COMPLAINT

CASE NUMBER: 1:19-mj-0424
-01
-02
-03
-04

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

Beginning at a date unknown, continuing until on or about April 12, 2019, in the Southern District of Indiana and elsewhere, defendants HUGO RAMON ROSALES-MORENO, CHRISTIAN PAZ-RECARTE, KATHERINE MONIC NAVARRO, and KELIN CLARISSEL MORALES-MARTINEZ, did Conspire to Distribute 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

I further state that I am a Special Agent, and that this complaint is based on the following facts:

See attached Affidavit

**Continued on the attached sheet and made a part hereof.**

Erik Collins, Special Agent (DEA)

**Sworn to before me, and subscribed in my presence**

April 15, 2019
**Date**

at   Indianapolis, Indiana

Mark J. Dinsmore, U.S. Magistrate Judge
**Name and Title of Judicial Officer**

**Signature of Judicial Officer**

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Erik Collins, being duly sworn under oath, states as follows:

## TRAINING AND EXPERIENCE

1. I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice. I am an investigative or law enforcement officer within the meaning of Section 2501(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2. I have been employed by the Drug Enforcement Administration (DEA) since 2011. I am currently assigned to the DEA Indianapolis District Office, Indianapolis, Indiana, and have been so assigned since June of 2017. During my employment as a law enforcement officer, I have participated in investigations involving the manufacturing, trafficking, and distribution of illegal narcotics. I have utilized, and am therefore familiar with, the following investigative techniques: consensual and court-ordered electronic surveillance; physical surveillance; pole or other camera surveillance; trash covers; the development and operation of informants and cooperating defendants; the execution of search warrants; consent searches; undercover agent operations; Global Positioning Systems; parcel package drug interdiction; motel drug interdiction; highway drug interdictions; and the debriefing of defendants, witnesses, informants, and others who have knowledge of drug trafficking and of the laundering and concealing of proceeds from drug trafficking.

3. In connection with my official DEA duties, I investigate criminal violations of state and federal controlled substances laws, including, but not limited to, Title 21, United States Code, Sections 841, 843, 846 and 848, as well as Sections 952, 960 and 963. I have received special training in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code. I

have been involved in various types of electronic surveillance and in the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and the laundering and concealing of proceeds from drug trafficking, in violation of Title 18, United States Code Sections, 1956 and 1957. I have received training in investigations involving the interception of wire and electronic communications. I am familiar with the ways in which drug traffickers conduct their business, including, but not limited to, their methods of importing and distributing controlled substances and their use of telephones and code language to conduct their transactions.

4. I have participated in federal electronic wiretap investigations involving individuals involved in the trafficking and distribution of controlled substances. I am familiar with the ways in which narcotics traffickers conduct their illicit business, including, but not limited to, their methods of importing and distributing controlled substances and their use of telephones and coded language to conduct their transactions.

5. This affidavit is submitted in support of a complaint charging Hugo Ramon Rosales-Moreno, Christian Paz-Recarte, Katherine Monic Navarro and Kelin Clarissel Morales-Martinez with Conspiracy to Distribute 400 grams or more of a Mixture or Substance Containing a Detectable Amount of Fentanyl, in violation of Title 21, United States Code Sections 841(a)(1) and 846.

6. The statements contained in this Affidavit are based in part on my experience and background as a Special Agent of the DEA; on information provided by and conversations held with other law enforcement officers, including Special Agents/Task Force Officers of the DEA, officers of the Indiana State Police (ISP), officers of the Putnam County Sheriff's Office (PCSO), other law enforcement officers, and others described below; and on a review of reports.

7. I have not included each and every fact that has been revealed through the course of this

investigation. I have set forth only the facts that are believed to be necessary to establish the required foundation for the issuance of the requested Arrest Warrants.

## FACTS AND CIRCUMSTANCES

8. On April 12, 2019, at approximately 10:52 a.m., Indiana State Police Trooper Yan Dravigne was conducting stationary traffic enforcement travelling east on Interstate 70 in Morgan County, Indiana. While Trooper Dravigne was surveilling traffic passing his position, Trooper Dravigne observed a white Ford F-150 pickup truck bearing California license plates following a tractor trailer at an unreasonably close distance. Trooper Dravigne then observed that same Ford F-150 pickup truck suddenly merge into the passing lane of traffic without properly signaling its intention to switch lanes. As the Ford F-150 merged into the passing lane, Trooper Dravigne activated his LIDAR (a device which uses laser to track the speed of moving vehicles) and tracked the Ford pickup trucks speed at 60 miles per hour in a 70 miles per hour zone causing traffic to slow. Trooper Dravigne quickly caught up to the Ford F-150 pickup, and attempted to view the occupants of the vehicle as he drove next to the truck, but Trooper Dravigne was unable to see inside the vehicle due to excessively dark window tinting.

9. Trooper Dravigne initiated a traffic stop, and the Ford F-150 came to a stop on the right shoulder of Interstate 70 East. As Trooper Dravigne approached the truck, Trooper Dravigne motioned to the driver to exit the vehicle since Trooper Dravigne was unable to see inside the vehicle. The driver, later identified as Christian PAZ-RECARTE (hereinafter, PAZ), complied and exited the vehicle. Trooper Dravigne observed PAZ to be overly nervous and could see his body physically trembling. Trooper Dravigne also observed that PAZ's eyes were bloodshot and PAZ appeared to be overly tired. During the conversation with PAZ, PAZ informed Trooper Dravigne that he did not possess the proper documentation to drive a vehicle and that he did not speak the English language. PAZ then montioned Trooper Dravigne towards the truck, and requested that Trooper Dravigne speak with PAZ's girlfriend "Alejandra," because

she spoke English.

10. Trooper Dravigne approached the passenger side of the Ford F-150 and made contact with the front seat passenger, who identified herself with a California identification card as Katherine Monic NAVARRO. During the conversation between Trooper Dravigne and NAVARRO, NAVARRO stated that she was PAZ's girlfriend and that they were travelling from Los Angeles, California to Columbus, Ohio to visit NAVARRO's aunt "Margaret" for two to three days. NAVARRO further stated that she has never visited this aunt, and didn't know her address except that her aunt lives near a University in Columbus, Ohio. NAVARRO also informed Trooper Dravigne that the other occupants of the vehicle were just friends and not related to the aunt.

11. Trooper Dravigne then made contact with a male in the rear of the Ford F-150, who identified himself by Mexico Matricula Consular identification card as Hugo Ramon ROSALES-MORENO, and a second female was also in the rear of the Ford F-150, who identified herself with a Honduras Passport as Kelin Clarissel MORALES-MARTINEZ. Trooper Dravigne noticed that both rear passengers also seemed overly tired and disoriented. At that time, Trooper Dravigne believed criminal activity was afoot and requested the assistance of the Putnam County Sheriff's Office.

12. Trooper Dravigne then returned to his Indiana State Police cruiser and asked PAZ to sit in the passenger seat of Trooper Dravigne's vehicle; PAZ complied. Trooper Dravigne began conducting routine checks and issuing written warnings as Trooper Dravigne engaged PAZ in a conversation about his travels. PAZ admitted that he has never had a license allowing him to operate a motor vehicle. PAZ further identified himself by writing his name and date of birth on a piece of paper in Trooper Dravignes' car as Christofer PAZ-RECARTE, DOB XX/XX/1990. PAZ stated that the passengers' names were Kelly, Chavelo, and Mimosa. PAZ further stated that the vehicle belonged to PAZ's wife, Cherly Hernandez. PAZ stated that his wife couldn't make the trip because she had to work in California. PAZ

stated that they were travelling to Columbus, Ohio to visit a family member of MORENO's, and that they would be there for three to four days.

13. After confirming the Ford F-150 pickup truck insurance certificate was expired, and confirming that none of the vehicle occupants were licensed to operate a motor vehicle, Trooper Dravigne contacted Indiana State Police dispatch and requested a Morgan County, Indiana wrecker service, in order to impound the vehicle. Trooper Dravigne then presented PAZ with a Spanish version of the consent to search form which includes the Indiana *Pirtle* warning and requested permission to search the vehicle. After reading the form, PAZ stated that he understood his rights and consented to search the vehicle both orally and by signing the form. Major Dwight Simmons of the Putnam County Sheriff's Office responded to the traffic stop and performed a free air sniff around the Ford F-150 pickup truck with his certified narcotics detection canine "Bo,"[1] which resulted in a positive alert to the odor of illegal drugs.

14. While performing a search of the Ford F-150, Trooper Dravigne found a plastic grocery bag in a large truck mounted toolbox on the back of the truck. When Trooper Dravigne opened the plastic bag he observed two cellophane wrapped kilogram size packages suspected to contain illegal narcotics. All suspects were placed in custody at that time. A further search of the Ford F-150 revealed an additional four kilogram sized packages hidden beneath the windshield cowling. A Morgan County, Indiana wrecker service responded to the traffic stop and towed the vehicle to its business location (hereinafter, "the garage"). Trooper Dravigne and Deputy Simmons followed the wrecker service and Ford F-150 to the garage with all four individuals.

15. At the garage, a field test was performed on one of the kilogram packages using a TruNarc

---

[1] "Bo" is a 10 year old yellow Labrador, single-purpose narcotics detection dog with the Putnam County Sheriff's Office, Indiana. Bo was first certified in November 2009 with the International Police Working Dog Association (IPWDA) by Sgt. Dennis Wade, a Master Instructor with the Indiana State Police. Bo has been re-certified on a yearly basis and is trained to detect the following odors: marijuana, methamphetamine, cocaine, heroin, ecstasy. Bo is trained to passively alert to a narcotic odor by sitting.

device. Subsequent to the field test utilizing the TruNarc it was determined that the substance contained in the kilogram wrapping gave a positive result for the presence of fentanyl (that is, N-phenyl-N-[1-(2-phenylethyl-4-piperidinyl] propanamide, a Schedule II Controlled Substance). The amount of this substance seized from the vehicle on April 12, 2019 exceeded 400 grams.

16. At approximately 3:02 p.m. on April 12, 2019, Katherine NAVARRO was interviewed by law enforcement officers, which occurred at the garage in Morgan County, Indiana. NAVARRO, an English speaker, had previously been read her *Miranda* Rights, and had agreed to speak with law enforcement without the presence of an attorney. At the beginning of NAVARRO's statement, NAVARRO confirmed that she had fully understood her rights when they were previously read to her. In the course of this interview, NAVARRO acknowledged that she knew that the trip's purpose was to deliver illegal drugs, but denied knowledge of what specific drug was to be delivered. NAVARRO admitted that she was being paid to participate in this trip to Ohio to deliver drugs.

17. At approximately 3:13 p.m. on April 12, 2019, law enforcement officers conducted a consensually recorded interview with Christian Noe PAZ at the gargage. Detective Cuevas read PAZ his *Miranda* Rights in the Spanish language from the DEA-13a oral warning card, and PAZ stated that he understood his rights and was willing to speak with law enforcement. In the course of the recorded interview that followed,[2] PAZ stated that all four occupants of the car knew the purpose of the trip was to deliver drugs to an individual in Ohio. PAZ acknowledged that he was participating in this trip for financial compensation.

18. At approximately 4:10 p.m. on April 12, 2019, law enforcement officers conducted an audio recorded interview with Kelin Clarissel MORALES-Martinez. One of the officers began to read MORALES her *Miranda* Rights in the English language from DEA-13a card; as the agent was reading

---

[2] PAZ made his statement in the Spanish language, and it was translated a law enforcement officer who is fluent in both the Spanish and English languages.

MORALES her rights, MORALES stated that she understood English, but would like to have her rights read to her in Spanish. Detective Cuevas, who is fluent in both the Spanish and English languages, then read MORALES her rights in the Spanish language from the DEA form. In the course of the recorded interview that followed, MORALES stated that she was supposed to help drive the vehicle to Ohio. MORALES stated that while they were on the road to Ohio, she became aware that they had drugs, but claimed that she did not know the quantity or type. MORALES stated that while they were on this trip, she had asked MORENO the quantity of drugs that they were transporting in the car, and MORENO asked MORALES why she cared—that is, MORENO was unwilling to give MORALES more details about the type and amount of controlled substances that they were delivering. In the course of the interview, MORALES again confirmed that she knew they were transporting controlled substances to Ohio. MORALES acknowledged being paid $1,000 to assist in driving this drug-laden vehicle from California to Ohio.

## CONCLUSION

19. Based upon my training and experience and the facts set forth herein, I submit that probable cause exists for the arrest of Hugo Ramon Rosales-Moreno, Christian Paz-Recarte, Katherine Monic Navarro and Kelin Clarissel Morales-Martinez, as set forth above.

*Erik Collins*
Erik Collins, Special Agent
Drug Enforcement Administration.

Sworn to before me on this
15th day of April, 2019

MARK J. DINSMORE
United States Magistrate Judge
Southern District of Indiana